UNITED STATES *v.* BALFOUR, GUTHRIE & Co., LTD. (No. 4698)[1]

United States Court of Customs and Patent Appeals, March 18, 1952

*Charles J. Wagner,* Acting Assistant Attorney General (*Richard F. Weeks,* special attorney, of counsel), for the United States.

*Jerome G. Clifford* for appellee.

[1] C. A. D. 487.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges

JOHNSON, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Second Division, rendered pursuant to its decision, Abstract 55709, 27 Cust. Ct. 266, granting appellee's petition for remission of additional duties assessed by the Collector of Customs at the port of Philadelphia, Pennsylvania, for underevaluation, under the provisions of section 489 of the Tariff Act of 1930, 19 U. S. C. § 1489, the pertinent part of which reads as follows:

Sec. 489.   Additional Duties:

If the final appraised value of any article of imported merchandise which is subject to an ad valorem rate of duty or to a duty based upon or regulated in any manner by the value thereof shall exceed the entered value, there shall be levied, collected, and paid, in addition to the duties imposed by law on such merchandise, an additional duty of 1 per centum of the total final appraised value thereof for each 1 per centum that such final appraised value exceeds the value declared in the entry.   * * *   Such additional duties shall not be construed to be penal and shall not be remitted nor payment thereof in any way avoided, except in the case of a clerical error, upon the order of the Secretary of the Treasury, or in any case upon the finding of the United States Customs Court, upon a petition filed at any time after final appraisement and before the expiration of sixty days after liquidation and supported by satisfactory evidence under such rules as the court may prescribe, that the entry of the merchandise at a less value than that returned upon final appraisement was without any intention to defraud the revenue of the United States or to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise.   * * *

The merchandise consists of boiled cottonseed soapstock imported from Argentina which was purchased in 1941 by appellee through Henry G. Perry, its assistant vice-president, who was in charge of the department that purchases all foreign oils and fats.

The merchandise is covered by two purchase contracts and the entry consists of two different invoices; one lot was purchased March 12, 1941, at $0.0190 per pound and the other lot was purchased on March 15, 1941, at $0.0195 per pound. The merchandise was shipped on April 29, 1941, and was entered at a unit price of $0.0195 per pound on June 5, 1941. On August 3, 1948, it was advanced in value by the appraiser, thus causing an assessment thereon of an increase of $105.15 in regular duty and $936.50 in additional duties. The petition is for the refund of the additional duties.

The testimony discloses that appellee instructed J. W. Hampton, Jr. and Co., appellee's custom-house brokers, to enter the merchandise. It was stipulated that at the time of the entry in question Mr. Howard Wilson and Mr. Hafer were partners in J. W. Hampton, Jr. & Co.; that both Mr. Wilson and Mr. Hafer took part in making the entry and that Mr. Hafer signed the entry; that Mr. Wilson has since died

and that Mr. Hafer was ill and could not appear to testify. It was further stipulated that if Mr. Wilson or Mr. Hafer were present, he would testify in substance that they made the entry on the basis of the price stated in the consular invoice in the absence of any other information from appellee.

It was also agreed that they would testify that neither of them knew of any higher value and that both would testify that they did not withhold any information from the appraiser; that they did not intend to deceive the appraiser as to value; and that they did not intend to defraud the revenue of the United States or to misrepresent the facts in the case.

Mr. Perry testified that he was in charge of purchases and that he contracted for the purchase of the involved merchandise; that it was the practice in his department, as soon as a purchase was made in a foreign country, for a series of five forms to be prepared which would give the complete details of each purchase; that copies of these forms were distributed to the traffic department, the invoice department, and the control department, so that the transaction could be followed through by the three departments so as to avoid errors; that the forms would also serve as a source of information to the import department so that from the time the purchase was made until the merchandise arrived in the United States fluctuations in value could be noted; that this served the purpose of keeping the import department up-to-date on prices; that the import department would come to him and ask him for the value of these various goods, particularly the goods that were assessed on an ad valorem rate of duty, so from the time a purchase was made until the merchandise arrived they would know whether there was a fluctuation up or down in values. Mr. Perry also testified that in 1941 he had information as to the prices of the imported merchandise "because I was buying this particular line of goods directly. I call Buenos Aires quite often by telephone and I was also buying some, rather from American producers in the Argentine through their New York office, so that there was always a double check on the value"; that he had quotations every other day or twice a week; that there was a rise in the market in the first half of 1941; that "To the best of my recollection, the last purchase I made in 1941 was about 1.9¢ per pound or $1.90 per one hundred pounds and within the first half of that year, I think I paid up to 3¼¢ or $3.25 per one hundred pounds"; that he passed along what information he had to Mr. Crosby, who was traffic manager.

Mr. Perry further stated that, in addition to himself, his assistant Mr. Mulcahy and the traffic department had information regarding the prices or value of the imported merchandise, that the merchandise was paid for before it arrived and that it was entered on the consular invoice value, which reflected the price paid for it. According to Mr.

Perry, the information he, Mr. Mulcahy, the traffic department and the import department had relative to the value of the merchandise in Buenos Aires at the time the merchandise was shipped and at the time the entry was made was not supplied to the customs officials because "There was no request for it."

Mr. Perry further testified as follows:

Q. Did you discuss with Mr. Crosby the prices at which these should be entered?
A. To the best of my knowledge they asked me what I considered to be the value and I said around the same value that we had purchased it for and I said "Let the entry go in and if the Examiner says no, I said, let's do it the right way."

Mr. Crosby testified that in March, April, May and June of 1941 he had charge of a portion of the Import Traffic Department and that his work included the merchandise here involved. It appears from the record that Mr. Hafer made the entry upon instructions issued by Mr. Crosby's office which had on file contracts covering all purchases made by Mr. Perry, including the involved merchandise. Mr. Crosby testified that he was unable to find that he personally transmitted the documents to J. W. Hampton, Jr. & Co., but stated that the person or persons who did so, under his supervision, would receive the papers from the Import Section, where the purchase prices and the documents were checked, and upon receipt of the documents in his section they were checked against the file as against subsequent purchases and then transmitted to the proper port of entry. In the case of this particular entry, he was unable to find in the files "any direction whatsoever to J. W. Hampton as to what price to use in passing the entry." He stated that the records relating to the importation involved are no longer in existence because of the general practice of appellee to store records in a storage warehouse and at the end of seven years to destroy them; that records relating to pending matters were normally kept but that those involved in this case were probably destroyed due to the extensive reorganization and turnover of personnel during the war years, particularly in the Import Traffic Section. Mr. Crosby stated that no amended entry was made and that "The only reason I can give for that is that it was simply carelessness on the part of myself and my staff, due to the press of other business and the confusion in reorganization," and that he did not have any intention to deceive the appraiser as to value or to defraud the revenue of the United States. He also stated that at the time the involved entry was made he had in his possession information regarding purchases of similar merchandise or the same merchandise, at higher prices, and that even though he had this information as to the higher market for export value, he did not attempt to amend the entry; and that prior to the making of the entry on June 5, 1941, he had knowledge of the above-mentioned higher prices but that he did not communicate the various prices to the brokers or to the customs officials at Philadelphia. He stated that the reason the merchandise was entered at

the lower value was "because of the reason I have stated; that it was entirely due to carelessness, confusion or whatever we might term it; it is definitely not intentional. The information was there and could have been furnished to the examiner. It was merely a case of not following up this particular entry."

Mr. Perry stated that he knew that if at the time of exportation the market had risen above the price on the date of purchase he would be obligated to enter at the advanced rates, that is, at the market price, but that was not done in the instant case due to "an error of some kind."

Mr. Clarence K. Young testified that he is employed by the United States Customs Examiner for the port of Philadelphia and that he passed upon the involved merchandise; that when the entry was made there were two consular invoices, one dated March 12, 1941, showing an invoice price of $0.0195 per pound, C. I. F., Philadelphia, and one dated March 15, 1941, showing an invoice price of $0.019 per pound C. I. F., Philadelphia; that when the invoices were received in the Philadelphia office both shipments were entered at $0.0195 per pound; that his first act, after having examined the merchandise, was the routine job of sending a report to the Customs Information Exchange as to value and classification; that a report was received wherein the New York appraiser stated they had written to appellee and received a letter from appellee, dated June 17, 1941, showing the prices as indicated in appellant's exhibit No. 1.

Appellant's exhibit No. 1 is as follows:

BALFOUR, GUTHRIE & CO., LIMITED

67 Wall Street

NEW YORK, *17th June 1941.*
Ref. WJM:VF

U. S. Appraiser,                                                     Dept. Oils & Seeds.
   201 Varick Street, New York, N. Y.
      (Attention: Mr. C. W. S. Curley, Examiner.)

GENTLEMEN: With reference to our telephone conversation of yesterday afternoon, we list below our purchases of Argentine Boiled Down Cottonseed Soapstock, subsequent to those tabulated in our letter of March 28th:

| Date | Cost per lb. | Terms | Packing | Shipment |
|------|--------------|-------|---------|----------|
|  | *Cents* |  |  |  |
| Mar. 31 | 1. 95 | C. I. F. | Barrels | April/May 1941. |
| Apr. 2 | 2. 11 | C. I. F. | do | May 1941. |
| Apr. 2 | 1. 95 | C. I. F. | do | June 1941. |
| Apr. 11 | 2. 35 | C. I. F. | do | June/July 1941. |
| May 8 | 2. 80 | C. I. F. | do | June 1941. |
| May 8 | 3. 30 | C. I. F. | do | June 1941. |
| May 15 | 3. 45 | C. I. F. | do | June 1941. |
| May 15 | 3. 50 | C. I. F. | do | June 1941. |
| May 28 | 3. 50 | C. I. F. | do | July 1941. |
| May 28 | 3. 75 | C. I. F. | do | July 1941. |
| May 29 | 3. 25 | C. I. F. | do | July 1941. |

All of the prices mentioned above are for shipment to Atlantic Coast ports such as Boston/New York/Philadelphia.

We trust that the above information will be of assistance to you, and if you wish any further particulars, please do not hesitate to call upon us.

Yours very truly,

BALFOUR, GUTHRIE & Co., LIMITED

(Signed) Wm. J. Mulcahy, Jr.

Mr. Young stated that, based on this letter, the appraiser advised the value should be $2.35 per pound rather than the entered value, which was C. I. F., export value, and therefore his office issued a notice of withheld appraisement showing the additional value between the entered value and the new value; that, in accordance with standard procedure, a copy of this report was sent to the collector's office and the original copy was forwarded to appellee's broker J. W. Hampton, Jr. & Co. although no notice was sent directly to appellee. He testified further that his office then requested a foreign investigation to be made in Argentina to determine the foreign and export values of the merchandise; that the question of the Argentine currency arose and that he was instructed to withhold appraisement on any merchandize which concerned the question of Argentine currency; that after the currency situation was straightened out in May, 1948, he rendered an advisory report to the appraiser at Philadelphia advancing the values over those reported by appellee; and that the appraiser made his appraisement on August 3, 1948 advancing the values over the entered values.

Appellee was a large importer and since the record indicates that J. W. Hampton, Jr. & Co. had been its broker for a number of years we must assume that the latter was an experienced customhouse broker. Surely they knew what was required of them when entering imported merchandise into the United States, but ignorance of the law or even lack of knowledge of the true value of the merchandise cannot of itself be accepted as an excuse or reason for the remission of the additional duties. *United States* v. *H. S. Dorf & Co.*, 36 C. C. P. A. (Customs) 29, C. A. D. 392, and cases there cited.

The record discloses that appellee instructed J. W. Hampton, Jr. & Co., customhouse brokers to make entry of the merchandise and sent the consular invoices which reflected the purchase price to the broker for that purpose, although appellee at that time knew the value of the merchandise had risen. One consular invoice showed the price of one lot of the merchandise to be $0.0195 per pound. The other consular invoice showed the price of that lot to be $0.019 per pound. Apparently the broker must have been advised by appellee as to what value to enter the merchandise as the merchandise covered by both consular invoices was entered at $0.0195 per pound. After the broker was notified that appraisement was being withheld, appellee could have filed an amended entry but did not do so.

There was a duty upon the appellee to enter the merchandise at the proper value and that duty was not performed.

In *R. W. Gresham* v. *United States*, 27 C. C. P. A. (Customs) 106, C. A. D. 70, this court stated:

It has frequently been pointed out that the entrant of merchandise owes a duty to inform himself as to the correctness of his representations as to the value of his merchandise and that a showing of indifference to its proper value does not meet the requirements of satisfactory proof under the statute.

In *Finsilver, Still & Moss* v. *United States*, 13 Ct. Cust. Appls. 332, T. D. 41250, the court stated:

* * * His statement in the evidence to the effect that he did not have such intent, standing alone, without corroborating facts or circumstances, being the issue to be determined by the court, certainly is not such proof as is required. And if the evidence he submits affirmatively shows that he represented a fact to be true, to wit, a certain value of his goods at the time of shipment, and at the time having no reasonable grounds for believing his representations to be true, or if it shows that his representations were made with reckless disregard of their truthfulness, it can not be said to corroborate his denial of intent but would have the opposite effect. Proof that a representation is made with the knowledge that reasonable inquiry might develop its untruthfulness would have the same tendency.

In the instant case appellee, at the time entry was made, knew of a rise in the value of the merchandise above the value for which it was entered. Appellee knew that $0.0195 per pound might not be the correct dutiable value of the merchandise. The only excuse offered for not notifying the customs officials of the rise in price as reflected in appellant's exhibit 1 was that of carelessness, or confusion, due to the changing of employees in the office of Mr. Perry and Mr. Crosby, although there is no direct evidence that any new employee had anything to do with making this entry.

The trial court was in error in holding that because the evidence did not warrant a finding that the petitioner made entry with intent to defraud, the petition for remission should be granted, The petitioner has the burden to show affirmatively that the entry was made withour intent to defraud. We think the petitioner has failed to meet that burden. Therefore, the judgment appealed from is *reversed*.